UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 08-50058 |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT AND |
| vs. | ) | RECOMMENDATION ON |
| | ) | DEFENDANT'S MOTION TO |
| ALLEN WELLS, | ) | SUPPRESS [DOCKET 17] |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the court pursuant to an indictment charging

defendant Allen Wells with one count of assault with a dangerous weapon, in

violation of 18 U.S.C. §§ 113(a)(3) and 1153.  Mr. Wells moves the court to

suppress statements made to federal and tribal law enforcement agents during

two interviews that occurred on April 25, 2008, and May 5, 2008, on the

ground that his statements were taken in violation of <u>Miranda</u>.[1]  [Dockets 46,

47].  The government resists Mr. Wells' motion.  Mr. Wells' motion to suppress

was referred to this magistrate judge for a report and recommendation to the

district court pursuant to Chief Judge Karen E. Schreier's standing order dated

June 11, 2007, and 28 U.S.C. § 636(b)(1)(B).

---

[1]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

## FACTS

An evidentiary hearing on Mr. Wells' motion was held on Friday, October 3, 2008.  Mr. Wells and his attorney, Assistant Federal Public Defender George Grassby, were present as was the attorney for the government, Assistant United States Attorney Mara Kohn.  Two witnesses testified in person at the hearing:  Oglala Sioux Tribe Public Safety Officer Jason Lone Hill and Special Agent Sherry Rice of the Federal Bureau of Investigation ("FBI").  The court finds the following facts from the evidence presented at the hearing.

Jason Lone Hill was on duty as a patrol officer for the Oglala Sioux Tribe Department of Public Safety on April 25, 2008.  Between the hours of 6:00 and 7:00 a.m., Officer Lone Hill was notified by dispatch that a fight had occurred at the Misty Rooks residence in Kyle housing.  Officer Lone Hill and another officer responded to the scene.  After taking a statement from the victim, Mark Poor Bear, Officer Lone Hill called medics to attend to Mr. Poor Bear, who had suffered two puncture wounds allegedly at the hands of Mr. Wells.

Officer Lone Hill and other tribal officers then began looking for Mr. Wells, who Officer Lone Hill testified was approximately 18 or 19 years of age.  Officer Lone Hill testified that Mr. Wells was familiar to him and other tribal police officers because he had had other contact with Mr. Wells through his duties as a police officer, including being present at one of Mr. Wells' arrests by another officer.  Officer Lone Hill testified that Mr. Wells had a

somewhat extensive criminal history as a juvenile in both the tribal court system and the state court system, and that Mr. Wells had been incarcerated at the Custer, South Dakota, boys camp for a period of time as a result of state court juvenile charges.  Officer Lone Hill testified that Mr. Wells had a reputation for drinking and fighting.

Officer Darrell Mesteth, also a tribal police officer, located Mr. Wells approximately 1 mile east of the Rooks residence a short time after the report of the assault was broadcast.  Officer Mesteth detained Mr. Wells and took him to the tribal jail facility at Kyle, South Dakota.  Officer Lone Hill traveled to that facility.

Upon arriving at the Kyle jail, Officer Lone Hill asked Mr. Wells in the presence of Officers Mesteth and Lieutenant Louis Quick Bear whether he had been drinking alcohol.  Mr. Wells answered "no."  Officer Lone Hill then administered a preliminary breath test ("PBT") to Mr. Wells, which registered zero, indicating that Mr. Wells had not ingested any alcohol.[2]  Officer Lone Hill indicated that his PBT machine is recalibrated monthly to make sure it is accurate and in good working order.  Officer Lone Hill then placed Mr. Wells under arrest on the tribal charge of assault.

---

[2]Officer Lone Hill testified that the tribal Department of Safety has a policy against taking statements from anyone who is intoxicated.  Hence, Officer Lone Hill administered the PBT to make sure Mr. Wells was not intoxicated prior to taking his statement.

Officer Lone Hill explained to Mr. Wells that he had been identified as the assailant in an assault on Mark Poor Bear at Misty Rooks' residence and that he wished to question Mr. Wells about that allegation.  Officer Lone Hill advised Mr. Wells that he had the right to remain silent, that any statement he gave could be used against him in a court of law, that he had a right to an attorney, and that if he could not afford an attorney, one would be appointed for him. Officer Lone Hill asked Mr. Wells if he understood these rights, and Mr. Wells indicated he did.  Officer Lone Hill then asked Mr. Wells if he understood that he had been given his rights and asked further if Mr. Wells would agree to waive those rights and speak to Officer Lone Hill.  Mr. Wells acknowledged that he had been advised of his rights and wished to speak to Officer Lone Hill. Officer Lone Hill then asked Mr. Wells a third time if he understood his rights and wished to make a statement.  Again, Mr. Wells said, "yes."  Officer Mesteth and Lieutenant Quick Bear were present during this exchange.

Officer Lone Hill then took Mr. Wells to an open area of the jail where the trustees eat their meals.  As described by Officer Lone Hill, this area is part of the secure facility that is the Kyle jail, but the room itself is open and other people came and went during the subsequent interview of Mr. Wells.  Officer Lone Hill was in his patrol uniform during this interview.  Mr. Wells was not restrained with handcuffs or any other device during the interview.

4

Preceding and during the interview, Officer Lone Hill observed nothing that indicated to him that Mr. Wells was suffering from a mental or physical impairment or from any intoxicating substance.  Mr. Wells' speech, gait, and eyes were entirely normal.  Officer Lone Hill observed no odors of inhalants, marijuana, or any other odor coming from Mr. Wells.  Furthermore, Mr. Wells' interactions with Officer Lone Hill indicated that he was tracking and understanding everything that was said to him.  Mr. Wells did not hesitate or otherwise indicate any uncertainty in his interactions with Officer Lone Hill. Officer Lone Hill testified that Mr. Wells' outward physical appearance was normal.  His eyes were not red, glassy, or dilated.  His speech was unaffected. There was no sign of injury on Mr. Wells.

During the interview, Officer Lone Hill asked open-ended questions.  He began by asking Mr. Wells to tell him in his own words what had happened. During his narrative, Mr. Wells described the knife with which he had attacked Mark Poor Bear.  At no time did Mr. Wells tell Officer Lone Hill that he himself had been assaulted in the events involving Mr. Poor Bear.  After Mr. Wells finished his narrative, Officer Lone Hill asked him if there was anything else he wanted to tell the officer.  Mr. Wells indicated "no."  Officer Lone Hill then showed Mr. Wells the knife that had been recovered from the scene of the assault and asked Mr. Wells if that was the same knife that he had described. Mr. Wells indicated it was.

Officer Lone Hill then asked Mr. Wells if he would write a written statement of the same facts that he had orally related to the officer so that the statement could be given to tribal prosecutors to review. Mr. Wells agreed to do so, and Exhibit 1 was introduced at the hearing as Mr. Wells' original hand-written statement. It is legible and cogently written.

At no time during the interview did Officer Lone Hill make any threats or promises of any kind to Mr. Wells. Officer Lone Hill did not make either an audio or video recording of the interview nor did he take any photographs of Mr. Wells. At no time during the interview did Mr. Wells indicate that he wanted an attorney or that he wished to stop talking to Officer Lone Hill. Mr. Wells never asked for a drink, for food, for a break, or to be allowed to visit the bathroom. The entire interview lasted approximately 15 minutes.

Officer Lone Hill testified that, at the time he interviewed Mr. Wells, he did not know whether federal charges would result from the assault. Officer Lone Hill did not tell Mr. Wells that he was facing potential federal felony charges. He also did not advise Mr. Wells of any potential penalties that might result from a conviction on such charges.

Agent Rice also testified at the hearing. She has been a special agent with the FBI for over 16 years. She was notified of the assault on Mark Poor Bear and began investigating. As part of her investigation, she reviewed a tribal report that had been written indicating that Mr. Wells, as a juvenile, had

6

attacked a corrections officer at a tribal juvenile detention facility.

A day or two prior to May 5, 2008, Agent Rice contacted Mr. Wells' mother.  Agent Rice identified herself to the mother, indicated that she was an FBI agent, and indicated that she wanted to interview Mr. Wells about the allegation that he had assaulted Mark Poor Bear.  Agent Rice told Mr. Wells' mother that no warrant for Allen's arrest had yet been issued and that she simply wanted to get Mr. Wells' side of the story.

Within approximately 24 hours, Mr. Wells himself called Agent Rice on her cell phone.  He indicated that he was living in Sunrise Housing near Martin, South Dakota.  Agent Rice relayed the same information to Mr. Wells as she had previously relayed to his mother–that she was an FBI agent, that no warrant for Mr. Wells' arrest had been issued, that he would not be arrested at the interview, and that Agent Rice wanted Mr. Wells' side of the story. Mr. Wells agreed to speak to Agent Rice.  The two then arranged a mutually-agreeable date and time for Agent Rice to travel to Mr. Wells' home and interview him.

The agreed-upon time was 11:30 a.m. on May 5, 2008.  Agent Rice showed up at Mr. Wells' home at the appointed time and Mr. Wells answered her knock at the door.  Other persons were present in Mr. Wells' home at the time, so Agent Rice suggested for privacy reasons that she and Mr. Wells talk in her vehicle.  Mr. Wells agreed.  Agent Rice sat in the driver's seat and

Mr. Wells sat in the front passenger seat.  At Mr. Wells' request, he kept the front passenger door open at all times during the interview.  Mr. Wells was not restrained in any way by handcuffs or any other device or obstacle during the interview.

In the vehicle, Agent Rice showed Mr. Wells her FBI credentials and again told Mr. Wells that she was there to talk to him about the assault on Mark Poor Bear.  Agent Rice told Mr. Wells that he was not under arrest and would not be arrested that day.  She further told him that he did not have to talk to her, but thanked him for agreeing to do so.  Agent Rice also told Mr. Wells that he could elect to stop the interview at any time.  Agent Rice told Mr. Wells that she expected him to tell the truth.

Agent Rice testified that she observed absolutely nothing about Mr. Wells' demeanor, conduct, or appearance that suggested he was not in complete control of all his physical and mental faculties.  There was no odor about him, no lack of coordination, his eyes were normal in appearance, and his speech was normal.  Mr. Wells never at any time indicated that he did not feel well or that he was injured.  His demeanor was cooperative and lucid at all times.  Agent Rice described Mr. Wells as "very articulate."  Agent Rice testified that her own demeanor was calm and matter-of-fact at all times.  She never raised her voice, threatened Mr. Wells, or made any promises.

The interview consisted in Agent Rice asking Mr. Wells open-ended questions.  She asked him to relay what had happened the day of the assault, beginning with the events of the evening before.  She allowed Mr. Wells to give a narrative answer, interrupting only to ask questions for clarification.

After finishing his narrative, Agent Rice asked Mr. Wells if he would agree to either write out his statement or allow her to make an audio recording of his oral statement.  Mr. Wells refused both.  Agent Rice told Mr. Wells that she would forward her interview to the United States Attorney's Office and that that office would make a decision as to whether to prosecute.  Agent Rice took a photograph of Mr. Wells at the conclusion of the interview so that she could remember what he looked like.

At no time during the interview did Mr. Wells indicate he wished to have an attorney present or that he wished to stop the interview.  Mr. Wells never asked for a break, for a drink, for food, or to be allowed to go to the bathroom. At the end of the interview, Mr. Wells was allowed to exit the vehicle and was not arrested.  Agent Rice never told Mr. Wells to restrict his travel in any way at the conclusion of the interview.  The entire interview lasted approximately 40 minutes.  Agent Rice never advised Mr. Wells of his <u>Miranda</u> rights at any time before, during, or after the interview.  Agent Rice did not specifically tell Mr. Wells that he would be subject to potential federal felony charges or what any of the penalties might be if he were convicted of such charges.

9

## DISCUSSION

**A.     April 25, 2008, Interview**

Mr. Wells moves to suppress statements made to Officer Lone Hill during the April 25, 2008, interview at the tribal jail on the ground that the statements were taken in violation of the protections afforded by Miranda. Mr. Wells argues that Officer Lone Hill provided incomplete and inaccurate Miranda warnings by failing to advise Mr. Wells that he could face federal charges.  Id.  Mr. Wells also argues that the waiver of his Miranda rights was not knowing, intelligent, or voluntary because of the following factors:  he did not understand that his statements could subject him to federal charges; he was not "well-educated in legal matters"; he did not have the benefit of counsel; he was not tested for the presence of narcotics in his system; and he was "young, in jail, and not legally sophisticated."  Id.

The government resists Mr. Wells' motion to suppress his April 25, 2008, statements, arguing that Officer Lone Hill did not violate Mr. Wells' Miranda rights.  The government does not dispute that this interview took place while Mr. Wells was in custody and that Officer Lone Hill initiated the questioning. Id.  Thus, the government recognizes that, because Mr. Wells was subject to custodial interrogation, Officer Lone Hill was required to provide Miranda

warnings to Mr. Wells and to secure Mr. Wells' waiver prior to questioning.[3]

However, the government maintains that Officer Lone Hill administered

complete and accurate <u>Miranda</u> warnings as he was not required to advise

Mr. Wells of the possibility of federal charges.  The government also maintains

that Mr. Wells understood his <u>Miranda</u> rights and validly waived his rights

prior to questioning.  <u>Id.</u>  The issue before the court with respect to the April

25, 2008, interview is whether the <u>Miranda</u> warnings administered to Mr. Wells

were complete and accurate and whether Mr. Wells' waiver was voluntary,

knowing, and intelligent.[4]

---

[3]A <u>Miranda</u> warning is required prior to questioning whenever two conditions are present:  (1) the suspect is being interrogated and (2) the suspect is in custody.  <u>Unites States v. Flores-Sandoval</u>, 474 F.3d 1142, 1146 (8th Cir. 2007); <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990; <u>United States v. Carter</u>, 884 F.2d 368, 371 (8th Cir. 1989).  Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect.  <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).  A suspect is considered to be "in custody" either upon his formal arrest or "under any other circumstances where the suspect is deprived of his freedom of action in any significant way."  <u>Griffin</u>, 922 F.2d at 1347 (citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 429 (1984)).

[4]The court notes that Mr. Wells does not argue that his statements at either interview were involuntary, that is, that they were "extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."  <u>United States v. LeBrun</u>, 363 F.3d 715, 724 (8th Cir. 2004) (rehearing *en banc*) (quoting <u>Simmons v. Bowersox</u>, 235 F.3d 1124, 1132 (8th Cir. 2001)).  As there is no evidence of such conduct on the part of Officer Lone Hill or Agent Rice and as Mr. Wells does not raise this issue, the court will not address it in this discussion.

### 1.    Whether the <u>Miranda</u> Advisement was Complete and Accurate

The holding in <u>Miranda</u> "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning."  <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing <u>Miranda</u>, 384 U.S. at 444).  <u>Miranda</u> warnings protect an individual's Fifth Amendment privilege against self-incrimination by "ensuring that a suspect knows that he may chose not to talk to law enforcement, to talk only with counsel present, or to discontinue talking at any time."  <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987).

Mr. Wells argues that the advisement of <u>Miranda</u> warnings was inaccurate and incomplete because Officer Lone Hill did not specifically advise him that he faced potential federal charges rather than just tribal charges.  The Eighth Circuit has rejected the argument "that <u>Miranda</u> requires a specific warning on the potential sentencing consequences of waiving the right to remain silent."  <u>United States v. Johnson</u>, 47 F.3d 272, 277 (8th Cir. 1995).  The <u>Miranda</u> Court required that, prior to custodial interrogation, a suspect must be advised "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  <u>Miranda</u>, 384 U.S. at 445.  "[T]here are no magic words that automatically satisfy <u>Miranda</u>'s

12

constitutional concerns.  Instead, the appropriate inquiry is whether the warning that [defendant] received reasonably conveyed his constitutional rights as required by <u>Miranda</u>."  <u>Thai v. Mapes</u>, 412 F.3d 970, 977 (8th Cir. 2005) (citations omitted).  Because the <u>Miranda</u> Court "did not prescribe an exact format or postulate the precise language that must be used in advising a suspect of his constitutional right to remain silent..., the substance and not the form of the warnings should be of primary importance."  <u>Tucker v. United States</u>, 375 F.2d 363, 369 (8th Cir. 1967).

The advisement of rights given in this case encompassed everything required by <u>Miranda</u>.  Officer Lone Hill was not under any legal obligation to tell Mr. Wells that federal charges may be filed or to inform Mr. Wells of the possible penalties for those charges.  Officer Lone Hill is a tribal police officer, not a federal prosecutor.  It would be nearly impossible for Officer Lone Hill to determine what federal charges, if any, were supported by the evidence and what penalties could result.  The court concludes that Officer Lone Hill accurately and adequately advised Mr. Wells of his rights prior to questioning.

### 2.    Whether Mr. Wells' <u>Miranda</u> Waiver Was Valid

Mr. Wells argues that the waiver of his <u>Miranda</u> rights was not voluntary, knowing, or intelligent.  Whether Mr. Wells' statements should be suppressed pursuant to the rule in <u>Miranda</u> depends on whether he effectuated a valid waiver of his <u>Miranda</u> rights prior to making statements to Officer Lone Hill.

13

It is the government's burden to prove that Mr. Wells' waiver was voluntary, knowing, and intelligent.  United States v. Caldwell, 954 F.2d 496, 508 (8th Cir. 1992).  "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."  Miranda, 384 U.S. at 475.  The government must prove that a waiver was voluntary, knowing, and intelligent by a preponderance of the evidence.  Colorado v. Connelly, 479 U.S. 157, 168 (1986).

Whether Mr. Wells effectively waived his Miranda rights requires two inquiries:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

"Only if the 'totality of circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."  Jones, 23 F.3d at 1313.  Examination of the totality of circumstances includes, but is not limited to, such considerations as the "background, experience, and

14

conduct" of the defendant.  Jones, 23 F.3d at 1313 (quoting United States v. Barahona, 990 F.2d 412, 418 (8th Cir. 1993)).

### a.     Whether Mr. Wells' Waiver was Voluntary

With regard to the inquiry of voluntariness, "[i]n considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998).  "Absent evidence that [defendant's] will [was] overborne and his capacity for self-determination critically impaired *because of* coercive police conduct," a waiver of Miranda rights will be considered voluntary. Spring, 479 U.S. at 574 (emphasis supplied). The same analysis applies to determining whether a defendant's confession under the Fifth Amendment or Miranda waiver were voluntary.  See United States v. Makes Room For Them, 49 F.3d 410, 415 (8th Cir. 1995) (a court must consider the conduct of the police when determining whether defendant's will was overborne with regard to either his confession or his Miranda waiver).

The court must look to the totality of the circumstances, "including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." Id.  "Coercive official activity is a necessary predicate to a finding that a statement is not voluntary. The fifth amendment privilege against

self-incrimination is not concerned with other types of psychological pressures. An incriminating statement is not involuntary unless extorted from the accused by means of coercive activity." United States v. Goudreau, 854 F.2d 1097, 1099 (8th Cir. 1988) (citations omitted).

The Supreme Court has indicated that the physical and mental state of the defendant is relevant to the inquiry as to what constitutes "coercion." See Spring, 479 U.S. 564. Under the totality of circumstances test, the defendant's characteristics are relevant to the extent that the police knew or should have known of those characteristics and deliberately exploited them. See Blackburn v. Alabama, 361 U.S. 199 (1960). In other words, although police coercion is *required* before a statement can be found involuntary, the defendant's mental status is considered in deciding *whether* police coercion existed. See Connelly, 479 U.S. at 164 ("as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.' ")

In Spring, the defendant had been told that police wanted to interrogate him about some firearms offenses. Spring,479 U.S. at 566-567. The police advised the defendant of his Miranda rights, which he waived. Id. During the

course of the interrogation, the police questioned the defendant about his involvement in a murder.  Id. at 567.  The defendant later argued that the waiver of his Miranda rights was "compelled" because he was not told at the inception that he would be questioned about the murder.  Id. at 573.  The Court rejected this argument, stating that, "[h]is allegation that the police failed to supply him with certain information does not relate to any of the traditional indicia of coercion: 'the duration and conditions of detention…, the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance or self-control.' "  Id. at 574 (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)); see also United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (court held that the defendant's confession was voluntary even if he "was confused and confessed to the crime on the mistaken belief that he had been promised leniency (or even if he had been promised some form of leniency)").

The Eighth Circuit came to the same conclusion in Makes Room for Them, in which the defendant argued that both his confession and Miranda waiver were involuntary due to his lower-than-average intelligence.  Makes Room for Them, 49 F.3d at 415.  The defendant contended that his limited intellectual abilities made him more susceptible to having his will overborne. Id.  The court rejected this argument, finding that, "[a]lthough age, education, and experience are factors in the voluntariness analysis, they are not

17

dispositive." Id.  The court further stated:

> We may assume for the sake of argument that Makes Room had a
> somewhat diminished capacity to resist pressure to waive his
> rights and confess.  However, this is one of two factors; we must
> also consider the conduct of the police.  We simply do not find the
> requisite coercive activity here.

Id. (internal citations omitted); see also United States v. LeBrun, 363 F.3d 715,

726 (8th Cir. 2004) (rehearing en banc) ("Generally, [the court] ha[s] concluded

that where the defendant possessed at least average intelligence, then his

inculpatory statements were not compelled.") (citing United States v. Gallardo-

Marquez, 253 F.3d 1121, 1123-24 (8th Cir. 2001) (concluding confession was

voluntary where defendant was of average intelligence and had prior contact

with law enforcement); United States v. Astello, 241 F.3d 965, 968 (8th Cir.

2001) (concluding that confession of an eighteen-year-old boy was voluntary

where he had completed the eleventh grade and possessed a capacity to

understand what was being said during the interview; Simmons v. Bowersox,

235 F.3d 1124, 1134 (8th Cir. 2001) (concluding that confession was voluntary

where defendant had full scale I.Q. of 88); cf. Wilson v. Lawrence County, 260

F.3d 946, 949 n.4 (8th Cir. 2001) (finding involuntary confession where

defendant was mentally retarded, his overall mental abilities were in the

bottom two percent of the population, and testimony revealed that he could be

"talked into anything")).

18

Further, "neither exhaustion nor intoxication will necessarily invalidate a Miranda waiver." United States v. Korn, 138 F.3d 1239, 1240 (8th Cir. 1998). The Eighth Circuit "has declined to adopt a per se rule of involuntariness founded solely on intoxication." United States v. Annis, 446 F.3d 852, 855 (8th Cir. 2006). "Instead, 'the test is whether these mental impairments caused the defendant's will to be overborne.' " Id. (citing United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990)); see also Unites States v. Contreras, 372 F.3d 974, 977-78 (8th Cir. 2004) (although defendant had used methamphetamine the evening before and marijuana the day he consented to a Miranda waiver, the court found that the waiver was voluntary because there was no evidence of police coercion and because defendant appeared lucid at the time and understood questions asked of him); United States v. Phillips, 506 F.3d 685, 687 (8th Cir. 2007) (although defendant had ingested four ecstasy pills and alcohol thirty-eight hours before being questioned by police, the court found that (1) his Miranda waiver was voluntary because there was no evidence of police coercion, deception, or intimidation, and (2) his waiver was knowing and intelligent because there was adequate time for any impairment to dissipate and defendant appeared lucid, cooperative, and aware of his rights during the interview).

In considering the totality of the circumstances surrounding the April 25, 2008, interview of Mr. Wells, there is simply no evidence that Officer Lone Hill

used any coercive tactics to overbear Mr. Wells' will or critically impair his ability for self-determination.  Nor does Mr. Wells assert that Officer Lone Hill obtained his statements by using violence or other deliberate means calculated to break his will.  The Eighth Circuit has recognized that every interrogation of a suspect contains some element of coercion or pressure to elicit a confession. See Astello, 241 F.3d at 967.  Examining "traditional indicia of coercion" leads to the conclusion that there were none in this case.  Officer Lone Hill made no threats, physical or psychological, or promises to induce Mr. Wells to waive his Miranda rights and make incriminating statements.  Officer Lone Hills' voice was calm and conversational, and he never raised his voice in anger or to intimidate Mr. Wells.  Officer Lone Hill was the only law enforcement agent conducting the interview.  Mr. Lone Hill was not handcuffed.  The entire interview lasted only 15 minutes.  Thus, "this is not a situation where the officers wore down a defendant's will with persistent questioning over a considerable length of time." LeBrun, 363 F.3d at 726.  Finally, although the interview took place at the tribal jail, this fact alone does not make the interview so coercive as to vitiate the voluntariness of Mr. Wells' waiver.  Based on the testimony presented at the suppression hearing, the court concludes that neither the conduct of Officer Lone Hill while questioning Mr. Wells nor the circumstances and conditions surrounding the questioning, e.g., the custodial environment, rose to the level of police coercion.

Further, Mr. Wells did not appear to be overly susceptible to police coercion, even if such coercion had occurred.  The court acknowledges that Mr. Wells was only 18 years old at the time of the interview.  However, the evidence also indicated that Mr. Wells has substantial experience with the legal system.  In addition, during the interview, Mr. Wells appeared to be mentally sound, cooperative and attentive to details, capable of understanding Officer Lone Hill's questions and responding appropriately, and not suffering from the effects of alcohol or drug use.  The portable breath test indicated that Mr. Wells was not under the influence of alcohol, and there is no evidence that he was under the influence of any other controlled substance.  He appeared clear-headed so much so that he was able to provide a legible, written statement at the conclusion of the interview.  Finally, there is no evidence that Mr. Wells suffered from any mental or physical impairments that diminished his free will. In light of Mr. Wells' sound mental and physical status, the court concludes that Mr. Wells voluntarily waived his Miranda rights and voluntarily made incriminating statements in response to Officer Lone Hills' questions.

### b.    Whether Mr. Wells' Waiver was Knowing and Intelligent

Mr. Wells argues that those same factors that rendered his waiver involuntary also rendered his waiver unintelligent and unknowing.  "A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the

right…" Thai, 412 F.3d at 977.  Although police coercion is a necessary

predicate to finding that a waiver was involuntary, it is *not* determinative on the

separate issue of whether the waiver was knowing and intelligent.  United

States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998).

"As a general matter … an accused who is admonished with the warnings

prescribed by this Court in Miranda has been sufficiently apprised of the

nature of his Sixth Amendment rights, and of the consequences of abandoning

those rights, so that his waiver on this basis will be considered a knowing and

intelligent one…" United States v. Garlewicz, 493 F.3d 933, 936 (8th Cir. 2007).

"Once it is determined that a suspect's decision not to rely on his rights was

uncoerced, that he at all times knew he could stand mute and request a

lawyer, and that he was aware of the State's intention to use his statements to

secure a conviction, the analysis is complete and the waiver is valid as a matter

of law." Moran, 475 U.S. at 422-423.

The Court in Miranda explained further:

> At the outset, if a person in custody is to be subjected to
> interrogation, he must first be informed in clear and unequivocal
> terms that he has the right to remain silent. For those unaware of
> the privilege, the warning is needed simply to make them aware of
> it– the threshold requirement for an intelligent decision as to its
> exercise.  More important, such a warning is an absolute
> prerequisite in overcoming the inherent pressures of the
> interrogation atmosphere. …
> The warning of the right to remain silent must be
> accompanied by the explanation that anything said can and will be
> used against the individual in court. This warning is needed in

order to make him aware not only of the privilege, but also of the
consequences of forgoing it. It is only through an awareness of
these consequences that there can be any assurance of real
understanding and intelligent exercise of the privilege.

Miranda, 384 U.S. at 467-468, 469.

In Turner, police officers stopped Turner's vehicle after observing erratic
driving.  Turner, 157 F.3d at 553.  Officers administered field sobriety tests to
Turner and concluded that he was under the influence of some drug other than
alcohol.  Id. at 554.  After arresting Turner and advising him of his Miranda
rights, officers transported him to jail and conducted a urine test, which came
back positive for phencyclidine (PCP).  Id.

Officers again advised Turner of his Miranda rights and Turner signed a
waiver form, initialing each admonition.  Id.  During the interview, Turner
appeared cooperative; however, he subsequently exhibited bizarre behavior.  Id.
Upon examination, several psychiatrists diagnosed Turner with a having a
PCP-induced psychotic disorder and an intelligence quotient ("IQ"), in the low-
average to borderline range.  Id.  Turner moved to suppress the statements he
made to law enforcement, arguing that, because of his low IQ, PCP
intoxication, and mental illness, he did not have the mental capacity to
intelligently and knowingly waive his constitutional rights.  Id.

The court rejected this argument, finding the following facts persuasive:
Turner was cooperative during the interview; he reviewed and initialed each

admonition of the waiver form; he agreed to answer questions; he gave accurate information; and he appeared intelligent enough to understand his rights.  Id. at 555; see also North Carolina v. Butler, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver...").  The Turner court concluded that Turner's waiver of his Miranda rights was knowing and intelligent.  Turner, 157 F.3d at 557.

Mr. Wells' mental and physical status was certainly no worse than that of the defendant in Turner.  Like the defendant in Turner, Mr. Wells was cooperative and responsive during the interview with Officer Wells and was intelligent enough to remember details of the assault and transcribe those details into written form.  Further, as stated earlier, the advisement of rights given by Officer Lone Hill fully and fairly described Mr. Wells' Miranda rights and did so in plain and simple language.  Mr. Wells indicated that he understood his rights and orally agreed to waive them.  The fact that Officer Lone Hill did not warn Mr. Wells that his responses could subject him to federal charges does not vitiate his Miranda waiver.  Miranda does not require "a specific warning on the potential sentencing consequences of waiving the right to remain silent." United States v. Johnson, 47 F.3d 272, 277 (8th Cir. 1995).  Nor does the Constitution require "that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment."

24

Spring, 479 U.S. at 574; see also United States v. Sanders, 341 F.3d 809, 817 (8th Cir. 2003) (a defendant "must show more than that he misunderstood the extent of his waiver or its ramifications..."); United States v. Peck, 161 F.3d 1171, 1174 (8th Cir. 1998) ("Lack of awareness of the potential adverse impact of statements is not sufficient in itself to invalidate a waiver of the right to counsel."). The court finds that Mr. Wells' Miranda waiver was knowing and intelligent.

**B.   May 5, 2008, Interview**

Mr. Wells also moves to suppress statements made to Agent Rice on May 5, 2008, on the ground that Agent Rice did not provide Miranda warnings prior to the start of the interview. Mr. Wells argues that he was in custody during this interview, in that he reasonably believed that his freedom of movement had been restrained to a degree associated with a formal arrest, and was entitled to receive Miranda warnings before being questioned. The government resists Mr. Wells' motion to suppress, arguing that Mr. Wells was not in custody during this interview and, thus, Agent Rice had no legal obligation to administer Miranda warnings to Mr. Wells. The issue before the court with respect to the May 5, 2008, interview is whether Mr. Wells was in custody so as to necessitate the giving of Miranda warnings.

### 1.     Case Law Defining Custodial Interrogation

As a preliminary matter, some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government.  See United States v. Charbonneau, 979 F. Supp. 1177 (S.D. Ohio 1997).  Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden.  See United States v. Moore, 104 F.3d 377, 391 (D.C. Cir. 1997).  The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have.  See e.g. United States v. Morriss, 2006 WL 3519344 (W.D. Mo. 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority).  For purposes of this report and recommendation, the court has placed the burden on the government to prove that Mr. Wells' statements were *not* the subject of custodial interrogation.

A Miranda warning is required prior to questioning only when a suspect is in custody while being interrogated.  See Griffin, 922 F.2d at 1347.  A suspect is considered to be "in custody" either upon his formal arrest or "under any other circumstances where the suspect is deprived of his freedom of action in any significant way."  Griffin, 922 F.2d at 1347 (citing Berkemer v. McCarty, 468 U.S. 420, 429 (1984)).  Absent formal arrest, a suspect is deemed is be "in custody" where a reasonable person in the suspect's position would have

26

believed that his freedom of action had been curtailed to a "degree associated with formal arrest." Berkemer, 468 U.S. at 442; United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); Griffin, 922 F.2d at 1347.  "Two discrete inquiries are essential to the [in custody] determination:  first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995).

In determining whether a suspect reasonably believed himself to be in custody, the court examines the totality of the circumstances.  United States v. Carter, 884 F.2d 368, 370 (8th Cir. 1989) (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)). The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator.  Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347.

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency:  (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2) whether the suspect possessed freedom of movement during the interrogation; (3) whether the suspect initiated contact with the interrogator or voluntarily acquiesced in the interrogation; (4) whether the interrogator

27

employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation.  See Flores-Sandoval, 474 F.3d at 1146-1147 (citing Griffin, 922 F.2d at 1349).  The first three factors are "mitigating factors which, if present, mitigate against the existence of custody at the time of questioning."  United States v. Axsom, 289 F.3d 496, 500-501 (8th Cir. 2002).  The last three factors are "aggravating factors which, if present, aggravate the existence of custody."  Id. at 501. Reference to these factors is helpful, but these factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly."  Flores-Sandoval, 474 F.3d at 1147.  In addition, the place where the interrogation took place, the purpose of the interrogation, the length of the interrogation, and other factors are also to be considered.  Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370.

Courts have given substantial weight to an interrogator's advising a suspect that no arrest is being made or will be made at the time of questioning, and that the suspect is free to decline to answer questions or to terminate the interrogation at any point the suspect so chooses.  For example, in United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), the court emphasized that "an express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of

28

demonstrating that he has not been taken into custody.  Id. at 826; see also Griffin, 922 F.2d at 1349-1350 ("The most obvious and effective means of demonstrating that a suspect has not been 'taken into custody or otherwise deprived of … freedom of action' is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.") (citations omitted).  However, the court also cautioned that the Griffin factors are by no means exhaustive and should not be applied "ritualistically." Czichray, 378 F.3d at 827.  Nonetheless, the Griffin factors still appear in Eighth Circuit case law after Czichray, and continue to be cited with approval for determining the custody issue.  See, e.g., United States v. Plumman, 409 F.3d 919, 923 (8th Cir. 2005).

Finally, whether a suspect was the focus of an investigation at the time the interrogation takes place is of little significance unless that fact was communicated to the suspect and contributed to the suspect's reasonable conclusion of not being free to go.  Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370 (citing United States v. Jimenez, 602 F.2d 139, 145 (7th Cir. 1979)).  As the Eighth Circuit explained:

> In evaluating whether [the defendant] was "in custody," we are not concerned with any moral or psychological pressures causing [the defendant] to be forthright and helpful to the agents.  Our examination only relates to the restraint imposed by the agents.  Under the relevant circumstances here, a reasonable person would have felt that he was at liberty to terminate the interrogation and walk away or turn his back on the agents.

29

Axsom, 289 F.3d at 503.

In United States v. Cates, 251 F.3d 1164 (8th Cir. 2001), where the defendant was interviewed on the front porch of her residence, the court determined that the defendants were not in custody, finding the following facts persuasive: the officers and the defendant arrived at the interview site separately; the officers were not in uniform and did not draw their weapons; the officers did not arrest the defendant at the conclusion of the interview; the defendant was free to move around, get up, and leave; the officers stressed that the defendant's decision to speak to the officers was hers alone; and the defendant never indicated a desire not to answer questions. Id. at 1167.

The court in United States v. Johnson, 64 F.3d 1120, 1125-1126 (8th Cir. 1995), found that the defendants were not in custody even though they were questioned in the back of a patrol vehicle. The factors which lead the court to its conclusion were that the officers specifically advised the defendants that they were not under arrest; the defendants were not handcuffed or otherwise restrained while in the squad car (although "their freedom of movement was somewhat restricted because they were questioned in squad cars"); the defendants were not isolated; other passengers in the defendants' vehicle remained at the scene; no strong arm tactics were employed; the questioning was straightforward; although the defendants did not initiate the police contact, both responded to the officer's questions; the officer who

30

questioned the defendants was not in uniform; and the defendants were not arrested at the scene.  Id. at 1126.  In sum, "the critical inquiry is not whether the interview took place in a coercive or police dominated environment, but whether the defendant's 'freedom to depart was restricted in any way.' " LeBrun, 363 F.3d at 720 (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

### 2.      Application to Mr. Wells' Interview

As stated earlier, two discrete inquiries are essential to determining whether a defendant was in custody during interrogation so as to require the advisement of Miranda rights.  Thompson, 516 U.S. at 112.  First, a court must examine the circumstances surrounding the interrogation.  Id.  Secondly, the court must determine whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave" in light of the totality of the circumstances.  Id.

### 1.      Circumstances of the Interview

The court finds the following circumstances surrounding Mr. Wells' interview relevant to the custody inquiry.  Agent Rice approached Mr. Wells while he was in the comfort and familiarity of the home where he was living. The date and time for the interview had been mutually agreed to by both parties.  After identifying herself, Agent Rice requested to speak to Mr. Wells about the assault incident, and Mr. Wells agreed.  Mr. Wells also agreed to sit

in Agent Rice's vehicle.  Mr. Wells sat in the front passenger seat of the vehicle while Agent Rice sat in the driver's seat.  The front passenger door to the vehicle remained open at all times during the interview.  The vehicle was parked in front of and in plain view of Mr. Wells' home.  Although Agent Rice initiated the interview, Mr. Wells voluntarily agreed to participate.  Agent Rice was the only law enforcement agent present to conduct the interview. Mr. Wells was not handcuffed or physically restrained in any way.  There is absolutely no evidence that Agent Rice physically or mentally abused, threatened, intimidated, or coerced Mr. Wells in any way.

Prior to the start of the interview, Agent Rice informed Mr. Wells that he was not under arrest and could terminate the interview and leave at any time. Mr. Wells indicated his understanding of these advisements by leaving the car door open.  The interview lasted approximately 40 minutes.  Mr. Wells provided a detailed narrative and was responsive to Agent Rice's questions.  He was cooperative and attentive during the entire interview.  Mr. Wells never expressed a desire to terminate the interview.  Agent Rice's tone of voice was calm and conversational, and she never raised her voice or shouted at Mr. Wells.  At the conclusion of the interview, Agent Rice asked Mr. Wells to provide a written or tape-recorded statement, but Mr. Wells refused.  Mr. Wells was not arrested following the interview nor was he told to restrict his travel in any way.

## 2.    Reasonable Person Standard

In determining whether a suspect reasonably believed himself to be in custody, the test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator.  Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347.  The court considers all of the facts and circumstances surrounding the interview in determining whether a reasonable person in Mr. Wells' position would have felt free to terminate the interview.  The court finds that, under an objective test and upon consideration of the six factors articulated in Griffin, a reasonable person would have felt free to refuse to answer Agent Rice's questions and to terminate the interview.  See Griffin, 922 F.2d at 1349.

In this case, Agent Rice specifically told Mr. Wells that he was not under arrest and that he was free to terminate the interview at any time.  Mr. Wells indicated his understanding by leaving the car door open.  Mr. Wells answered Agent Rice's questions and participated in the conversation in a cooperative manner.  Mr. Wells volunteered detailed information, suggesting that Mr. Wells was not reluctant to participate in the interview.  The atmosphere surrounding the interview was casual:  the interview took place in Agent Rice's unmarked vehicle which was parked in plain view of his residence and Agent Rice was the only law enforcement agent present.  The duration and conditions of the interview were unobjectionable.  Mr. Wells was not restrained in any way.

33

Lastly, Mr. Wells refused to provide a tape-recorded or written interview, suggesting that he did not feel intimidated or pressured by Agent Rice.

Further, there is no evidence that Agent Rice employed strong-arm tactics or deceptive strategies.  Her voice was not raised in anger.  Mr. Wells appeared to be mentally sound, capable of understanding Agent Rice's questions and responding appropriately, and free from the effects of alcohol or drug use.  Finally, Mr. Wells was not arrested at the conclusion of the interview nor was he told to restrict his travel in any way.  See United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002) (the fact that the defendant was not arrested upon conclusion of an interview was a "very important factor weighing against custody").

In sum, given the totality of the circumstances surrounding Mr. Wells' interview, a reasonable person in Mr. Wells' position would have understood that his participation in the interview was voluntary.  The evidence overwhelmingly supports the conclusion that the circumstances of this interview do not rise to the level of a custodial interrogation.  Mr. Wells was not "deprived of his freedom of action in any significant way."  See Griffin, 922 F.2d at 1347 (citing Berkemer, 468 U.S. at 429).  In light of the circumstances surrounding the interview, a reasonable person would not have believed that his freedom of action had been curtailed to a "degree associated with formal arrest."  See Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin,

34

922 F.2d at 1347; Carter, 884 F.2d at 370.  The court concludes that Mr. Wells was not in custody during the interview with Agent Rice, and, thus, Agent Rice was not required to advise Mr. Wells of his Miranda rights nor secure his waiver prior to questioning.

## CONCLUSION

Based on the evidence adduced at the hearing, the above findings of fact, and the law, the court recommends that Allen Wells' motion to suppress [Docket 17] be denied.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the district court.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated October 6, 2008.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE

35